Josephine PHILBRICK, Appellant,

v.

Jesse BROWN, Secretary of Veterans
Affairs, Appellee.

No. 91–958.

United States Court of Veterans Appeals.

May 11, 1993.

Before STEINBERG, Associate Judge.*

## MEMORANDUM DECISION

STEINBERG, Associate Judge:

The appellant, widow of World War II veteran James J. Philbrick, appealed from a February 14, 1991, decision of the Board of Veterans' Appeals (BVA or Board) denying entitlement to disability and indemnity compensation (DIC) under 38 U.S.C.A. § 1310 (West 1991) for the cause of her veteran husband's death. *Josephine Philbrick in the case of James J. Philbrick,* Supp.R. at 105–11. On May 26, 1992, the

* Note: This single-judge disposition is of no precedential value. See *Bethea v. Derwinski,* 2 Vet.

Court vacated the BVA decision and remanded the matter to the Board for readjudication because of, inter alia, the failure of the Board to provide adequate reasons or bases for its findings and conclusions, and the failure of the Secretary of Veterans Affairs (Secretary) to carry out his duty to assist. The Court retained jurisdiction. *Philbrick v. Derwinski,* 2 Vet.App. 466 (1992) (single-judge order).

On October 21, 1992, the Board issued a new decision, again denying the appellant's DIC claim. *Josephine Philbrick in the case of James J. Philbrick,* BVA 92–＿＿ (Oct. 21, 1992). On November 16, 1992, the appellant filed an opposition to the Board's October 21, 1992, decision and requested further review by the Court. On January 15, 1993, the Secretary filed a response to the appellant's opposition. On January 25, 1993, the appellant filed a response to the Secretary's January 15, 1993, response. On April 1, 1993, the appellant, through her representative, filed a motion to expedite the Court's decision, citing the appellant's fragile health. Also pending before the Court is the appellant's motion for oral argument, held in abeyance by the Court's August 30, 1991, order. Summary disposition is appropriate because the case is one "of relative simplicity" and the outcome is controlled by the Court's precedents and is "not reasonably debatable". *Frankel v. Derwinski,* 1 Vet.App. 23, 25–26 (1990). For the reasons set forth below, the appellant's motion for oral argument will be denied, the Board's decision will be vacated and the matter remanded, and the appellant's motion to expedite the Court's decision will be denied as moot.

### I. Background

The deceased veteran served on active duty in the U.S. Army from August 1943 to November 1945. R. at 10. Between December 1944 and May 1945, he was held by the German government as a prisoner of war (POW). R. at 60, 76. At the time of his death in February 1989, the veteran had

App. 252, 254 (1992).

been receiving service-connected disability compensation for several maladies and had been awarded noncompensable service connection for others. R. at 358–59. His adjudicated service-connected disabilities, which gave him a combined rating of 60% pursuant to 38 C.F.R. § 4.25 (1992), included post-traumatic stress disorder (PTSD), residuals of frozen feet, stomach ulcer, irritable bowel syndrome, hepatitis, peripheral neuropathy of the extremities, inactive pyoderma, residuals of vitamin deficiency, and residuals of pellagra. In its February 1991 and October 1992 decisions, the BVA concluded that the veteran's cause of death—congestive heart failure due to ventricular septal defect, which, in turn, was due to myocardial infarction (R. at 370)—was not itself shown to be service connected, and that none of the above service-connected disabilities had caused the heart problems leading to his death. Supp.R. at 110–11; *Philbrick*, BVA 92——, at 6.

The appellant filed her DIC claim in March 1989. R. at 372. In an August 1989 personal hearing at the Seattle, Washington, VA Regional Office (RO), she testified, under oath, regarding possible manifestations of heart problems following the veteran's discharge from service. She stated that, in 1947, when she had first met the veteran, he had fatigued easily and would become short of breath when climbing stairs or walking "for any distance". R. at 407–08. The appellant's daughter testified, under oath, that she had similar recollections of her stepfather's condition at the time she first met him in 1947. R. at 410–13. During the hearing, the appellant's representative asserted that the pathologist who had conducted the initial autopsy did not know that the veteran had been a POW and that he therefore had failed to conduct appropriate tests. R. at 405.

The appellant submitted a medical opinion provided by Dr. J.W. Onstad, chairperson of the Department of Pathology at St. Elizabeth's Hospital in Yakima, Washington. R. at 423. He indicated in his report that he had reviewed the autopsy report, prepared slides from the veteran's body, reviewed literature, and engaged in "professional consultation concerning imprisonment with reported vitamin, protein and carbohydrate malnutrition". Dr. Onstad, noting the similarities between the cause of death of this veteran and that of another former POW on whom he had conducted an autopsy (*see Betty J. Ivy*, No. 91–989 (U.S.Vet.App. Apr. 13, 1993) (unpublished memo, decision remanding to the Board)), stated, inter alia, that the veteran had "increased ventricular septal perivascular and interstitial fibrous tissue similar to that seen in [the other former POW]". *Ibid.* He concluded:

[I]n my professional opinion, Mr. James J. Philbrick more probable [sic] than not suffered irreversible heart damage (myocardial fiber loss) as a prisoner of war. Undernutrition and starvation have been reported to be associated with marked reduction of heart size corresponding to the loss of body weight. Any gastrointestinal [or] hepatic diseases/dysfunction would accentuate the underlying protein and carbohydrate malnutrition, as well as vitamin deficiency.

*Ibid.* The appellant also submitted a notarized statement from Harold W. Winters, who stated that he had been interned as a POW in the same camp as the veteran. Mr. Winters stated that all but 39 of the 139 POWs in that camp had died, most of starvation. Furthermore, he stated that all of the survivors had lost at least 60 pounds during internment. R. at 421. Additionally, prior to his death the veteran had testified under oath at a VA hearing that, during an in-service medical examination conducted in late 1945, the physician had instructed him to avoid hiking, marching, heavy work of any kind, and mental strain. The veteran asserted that he had received no explanation for these instructions, and the record does not contain any report in which they were set forth. R. at 165, 311.

Following the remand ordered by the Court, the appellant submitted additional evidence in support of her claim, including, inter alia, a May 1992 statement by Dr. Onstad, a December 1991 statement by Dr. Howard L. Platter, POW Medical Coordinator at the Spokane VA Medical Center

(MC), and a second affidavit, executed in May 1991, by Mr. Winters as well as an affidavit executed by Mr. Winter's spouse. Supp.R. at 143, 136–38, 123–26. In his May 1992 statement, Dr. Onstad stated that he had reviewed the veteran's medical records and autopsy report, including tissue samples, and considered his review "far more accurate than any examination conducted prior to Mr. Philbrick's demise". His findings were as follows:

There is currently ample evidence to support the conclusion that avitaminosis (most especially vitamin B complex deficiency) associated with protein and/or carbohydrate malnutrition may lead to cardiac atrophy and diminished "organ reserve". Thus the smallest of "disease insults" may result in premature demise. This in my professional opinion, (following thorough autopsy review, reading and professional consultation) is what occurred to Mr. Philbrick many years following prolonged internment and documented starvation/malnutrition.

Supp.R. at 143. Accompanying Dr. Onstad's statement were copies of two pages from an unidentified edition of ANDERSON'S PATHOLOGY. The first, page 92, concerns the relationship between cardiac failure and both malnutrition and vitamin deficiencies, and notes, with regard to beriberi heart disease, that "[t]he gross and microscopic features are not specific." Supp.R. at 139. The second, page 677, describes disturbances of cardiac growth, including cardiac atrophy related to starvation. Supp.R. at 140.

Dr. Platter's December 1991 statement, noting the evidence that the veteran had suffered a severe weight loss and malnutrition, stated:

Animal studies and data [none were cited] document a relationship between myocardial damage [and] severe malnutrition [and] perhaps atherosclerosis[. T]his previous severe malnutrition [and] avitaminosis would damage the myocardium and predispose the patient to septal rupture as well as C[oronary] A[rtery] D[isease]. Chest pain in POW camp may have been related to C[oronary] A[rtery] D[isease] symptomatic under severe stress.... Extreme exposure and disease in POW camp should [sic] have precipitated pulmonary disease and [sic] well contributed to the C[ongestive] H[eart] F[ailure] ... as well as the M[yocardial] I[nfarction].

Supp.R. at 136. Noting that the veteran had been chronically depressed and had been awarded service connection for PTSD, and noting further that pellagra (for which the veteran had been awarded service connection) can cause depression, Dr. Platter stated: "[T]his state would have increased [the] risk of terminal events [and] surgery [and] contributed to patient's demise". Supp.R. at 137. Summarizing his findings, Dr. Platter also stated: "There is little doubt that the severe malnutrition [and] avitaminosis, probably coupled with other factors noted beforehand as well, would have severely compromised the myocardium and contributed to this patient[']s death". Supp.R. at 138.

In his May 1991 affidavit, Mr. Winters gave additional details of the conditions that he and the veteran had endured during their joint captivity, including inadequate food and clothing, harsh winter weather, and forced labor. He stated that the veteran had complained of chest pain and had had difficulty breathing, and stated that, upon liberation by the Russians, the veteran had weighed 92 pounds. R. at 124–26. Mr. Winters stated that following service he had not had contact with the veteran until four years earlier, at which time the veteran seemed "depressed". R. at 123. In her affidavit, Mrs. Winters stated that at the time of that reunion, the appellant told her that the veteran would "sit in a room by hi[m]self in a corner", and that the reunion with Mr. Winters "was the first time [the veteran] had ever talked that much". *Ibid.*

In July 1992, the appellant submitted a report by Dr. Danya Portine Dilley, a physician at the U.S. Naval Hospital at Twentynine Palms, California, who had served as Clinical Coordinator for POWs at the Loma Linda, California, VAMC between 1987 and 1992. Additionally, Dr. Dilley's

statement describes her expertise in the diseases and sequelae of nutritional deprivation and notes her service as the Cleveland Clinic Foundation's liaison to the American Heart Association. Supp.R. at 221. Based on her review of the veteran's medical records and autopsy report, Dr. Dilley stated the following conclusion as to the relationship between the veteran's service and his cause of death:

In this case, his service experience severely debilitated [the veteran]. Circumstances and conditions of incarceration are fully consistent with the development of beriberi heart disease. His subsequent clinical course with apparent regression, late recrudes[c]ence and fulminant and abrupt decompensation [of the heart] are all consistent. Finally, autopsy findings definitively confirm the presence of findings of beriberi heart disease. In summary, conditions incurred in active m[ ]ilitary service materially contributed to [the veteran's] death.

Pertinent diagnoses are noted to include[:]

Beriberi heart disease, POW-related

Pulmonary asbestosis, POW-related

Pulmonary silicosis, POW-related

Supp.R. at 227.

That same month, the BVA requested an independent medical expert opinion from two physicians: Dr. James B. Atkinson, an Associate Professor of Pathology at Vanderbilt University and surgical pathologist associated with both Vanderbilt University Medical Center and the Nashville, Tennessee, VAMC; and Dr. Edward K. Kasper, Assistant Professor of Medicine and Medical Director of the Cardiomyopathy and Heart Transplant Program at Vanderbilt University. In a joint letter dated July 30, 1992 [hereinafter "IME report"], Drs. Atkinson and Kasper stated that they had been provided a copy of the autopsy report, glass slides from the autopsy, and "a portion of the patient's medical records dating to 1974". Supp.R. at 263. They stated their findings as follows:

[I]t is highly unlikely that cardiac impairment related to deprivation as a prisoner of war could have played a significant role in this patient's unfavorable outcome following myocardial infarction....

It is apparent from the clinical record and autopsy that this patient had at least three major risk factors for atherosclerotic heart disease (hypercholesterolemia, smoking history and hypertension) and suffered an acute myocardial infarction complicated by interventricular septal rupture.... There is no evidence to support the notion that caloric restriction worsens or contributes to the status of individuals with cardiovascular disease. In fact, it has been documented that "in 109 American [POWs] who developed beriberi ..., long-term follow-up failed to reveal a significantly higher incidence of heart disease than in a random sample of individuals in this age group" [citing P.I. Wagner, *Beriberi heart disease. Physiologic data and difficulties in diagnosis,* 69 AM.HEART J. 200–05 (1965)].

Supp.R. at 263–64 (citations omitted). The IME report challenges the validity of Dr. Dilley's diagnosis of beriberi heart disease and asserts that the "pathologic features of long-standing beriberi heart disease are not specific, and to suggest otherwise is misleading. This is well-documented in standard textbooks of cardiac pathology as well as in specific references in the scientific literature". Supp.R. at 264 (citations and quotations omitted). Disagreeing further with Dr. Dilley's report, the IME report stated:

We find nothing in the medical literature to date that supports the notion that "the smallest of 'disease insults'" in subjects with long-standing beriberi heart disease leads to "premature demise," nor would we consider rupture of the interventricular septum to be a minor "insult." Statements in the record to the contrary appear to be strictly anecdotal and, to our knowledge, have not been published or otherwise subject to peer review.

Supp.R. at 265–66. In a July 31, 1992, letter to the BVA, Drs. Atkinson and Kasper stated that, although their July 30 IME report stated that they had reviewed "the

patient's medical records dating to 1974", that statement

> does *not* infer [sic] that other pertinent records prior to that date were not available and reviewed. The past medical history dating to 1944 was well-documented in the records we received (including a lack of diagnosed cardiovascular disease), and of particular importance was clear documentation of this patient's physical state in 1944–45 as well as in subsequent years.

Supp.R. at 267 (emphasis in original). On August 4, 1992, at the request of the appellant's representative, Drs. Atkinson and Kasper provided an addendum to the IME report, addressing the possible role of stress in the veteran's acute coronary event. Noting "ample evidence" in the record that the veteran had suffered from chronic anxiety, the physicians stated: "Many investigators have tried to connect anxiety and stress with myocardial infarction and other acute coronary events. This relationship has not been definitively reported in peer[-]reviewed medical journals. We are unable to state with certainty that stress either played or did not play a role in his acute coronary event." Supp.R. at 270.

The appellant submitted an August 1992 letter from Dr. Onstad challenging the IME report. First, Dr. Onstad asserted that Drs. Atkinson and Kasper were biased because they were "University based and supported by government grants and/or [VA] associations." Supp.R. at 279. Further, he asserted that neither physician is a "clinicopathologic expert" on former POWs. *Ibid.* Dr. Onstad stated his agreement with the IME report's findings that "beriberi produces nonspecific pathologic changes." Supp.R. at 280. However, noting that the veteran had been awarded service connection for vitamin deficiency and peripheral neuropathy, Dr. Onstad concluded: "[I]t's only common sense that he suffered some degree of vitamin B heart damage during his internment.... *Since this cardiac finding is difficult to prove at autopsy, the [appellant] deserves the benefit of the doubt*". *Ibid.* (Emphasis in original.)

The appellant submitted an August 1992 letter from Dr. Platter, who wrote:

> [The veteran's] autopsy shows a dilated, failing heart with atherosclerotic disease and a cardiac rupture. It appears these changes were chronic with an acute fatal episode.... [W]hile as stated in the [IME report] it cannot be proven that the [veteran's] heart disease was caused by avitaminosis and malnutrition[, the IME report] in no way refutes the fact that this previous heart damage did not contribute to the patient's terminal event.... Pathologist findings on autopsy would be expected to be non-specific. However, this does not disprove the contributory potential of [the veteran's] severe malnutrition in his ... demise.

Supp.R. at 287–88. Also submitted was an extensive bibliography, apparently prepared under Dr. Platter's direction, of published works on the effect of starvation or malnutrition on the heart. Supp.R. at 299–317.

The appellant also submitted an August 1992 letter from Dr. Dilley. First, Dr. Dilley questioned the credentials of the physicians who had written the IME report, noting that they had had no clinical experience with former POWs, POW-protocol autopsies, or nutritional deprivation; she stated that she had provided ongoing internal medicine care to more than 600 former POWs and that Dr. Onstad had performed more than 200 POW autopsies for the Armed Forces Institute of Pathology. Supp.R. at 295–96. Next, Dr. Dilley pointed to several shortcomings in the 1965 study, quoted in the IME report, that had found no significantly higher incidence of heart disease in 109 former POWs who had suffered beriberi. She stated:

> The follow[-]up interval was shorter than that after which we subsequently see manifestations of late beriberi heart disease; the age group was younger. These data and conclusions were accurate 30 years ago; they have since been supplanted by more current findings [which] indicate[ ] two clusterings of recrudescence of beriberi heart disease, one at about 25 years and another at about 33–38 years out from the original insult.

*Ibid.* Dr. Dilley stated that she had "available on request" the following items, each of which, she asserted, "indicates premature degenerative changes and early demise in the preponderance of individual POW cases":

(1) unpublished findings from 4 practicing physicians who are themselves survivor POW[s]; (2) National Science Foundation/National Research Institute findings currently being developed and analyzed in 40–year followup of former POW[s] held in Korea; (3) POW morbidity and mortality statistics currently being matched to US Public Health Service normative data on a base of 500 former POW[s].

Supp.R. at 296. As to the autopsy findings, Dr. Dilley states:

The appellant in this case was found to have extensive, prolific myocardial brown atrophy. Brown atrophy is a "nonspecific" feature of premature aging, in that the human body has only a limited number of ways in which it manifests response to stressors which cause premature aging. Myocardium may develop brown atrophy in response to starvation, chemotherapy, prolonged hard labor at high altitude, or long[-]term industrial exposure, among other stressors. Brown atrophy, however, is not to be expected in a 67 [year-old] who had controlled hypertension and died of [a myocardial infarction]. It is to be expected in a POW who had cardiac complications of severe malnutrition.

*Ibid.* Dr. Dilley concluded: "In this case there is no medical doubt that the veteran's heart was involved in and compromised by the severe malnutrition of his POW incarceration.... I am compelled to reconfirm the pertinent diagnoses of beriberi heart disease, POW-related, and (incidentally found) pulmonary asbestosis and pulmonary silicosis, service-related." Supp.R. at 298.

On September 10, 1992, the Seattle RO issued a confirmed rating decision, Supp.R. at 328–30, and on October 21, 1992, the BVA issued the adverse decision here on appeal after remand from the Court. Supp.R. at 334–352.

## II. Analysis

■ The surviving spouse of a veteran who has died after December 31, 1956, may file a claim for DIC. *See* 38 U.S.C.A. §§ 1310, 1311 (West 1991). The veteran's death will be considered service connected where a service-connected disability was either the principal or a contributory cause of death. *See* 38 C.F.R. § 3.312(a) (1992). A service-connected disability is the principal cause of death when that disability, "singly or jointly with some other condition, was the immediate or underlying cause of death or was etiologically related thereto." 38 C.F.R. § 3.312(b) (1992). A contributory cause of death must be causally connected to the death and must have "contributed substantially or materially" to death, "combined to cause death", or "aided or lent assistance to the production of death." 38 C.F.R. § 3.312(c)(1) (1992). Therefore, the issue in this case is whether a service-connected disability was a principal or contributory cause of the veteran's death.

In its decision, the BVA made the following relevant findings of fact:

4. Cardiovascular disease is not shown during the veteran's active military service or within one year following separation and it is not shown to have been related to any incidents of service.

5. Beriberi heart disease, heart disease of any other type related to malnutrition, silicosis, and asbestosis are not shown at any time.

6. Any inservice pulmonary pathology was acute and transitory and resolved prior to separation without residual disability.

7. None of the veteran's service-connected disabilities were significant factors in causing or contributing to his death.

8. Asthma was not a significant factor in causing the veteran's death.

*Philbrick*, BVA 92–____, at 5–6.

### A. *Pulmonary Disease and Residuals of Frozen Feet*

■ This Court reviews BVA factfinding under a "clearly erroneous" standard;

"if there is a 'plausible' basis in the record for the factual determinations of the BVA, ... [the Court] cannot overturn them". *Gilbert v. Derwinski,* 1 Vet.App. 49, 53 (1990); 38 U.S.C.A. § 7261(a)(4) (West 1991). For the reasons set forth below, the Court finds that there is a plausible basis in the record for the Board's findings of fact concerning pulmonary disease (including asthma) and frozen-feet residuals.

1. **Pulmonary Disease:** The Board addressed the appellant's contentions that there was in-service onset of pulmonary problems, including silicosis, asbestosis, and/or asthma, which may have contributed to the veteran's death. The Board noted that, in his affidavit, Mr. Winters had stated that the veteran had had trouble breathing during his internment. The autopsy report noted a clinical history of steroid-dependent chronic obstructive pulmonary disease, but the Board noted that service medical records, including the separation examination, and subsequent VA examinations conducted between 1948 and 1988, had not shown any pulmonary problems, and that asthma had been first diagnosed in February 1989. *Philbrick,* BVA 92-____, at 17–18. Although Dr. Dilley's reports stated that the veteran had incurred silicosis and asbestosis due to forced mining work while a POW, the Board noted that the medical records, including the autopsy report, are devoid of mention of either disease. Further, the Board noted that during captivity the veteran had not worked in a mine, but instead pulled tree stumps—a finding supported by Mr. Winters' affidavits. *Philbrick,* BVA 92-____, at 18.

The Board next considered whether the veteran's service-connected psychiatric disorder may have aggravated his asthma, which in turn may have contributed to his death. Although the Board conceded that "[e]motional upset may be a symptom and this may indeed be a factor in aggravating an asthmatic attack", it noted that the bronchospasm, from which the veteran was suffering upon admission to the Seattle VAMC during his final illness in February 1989, was termed "mild" and was soon resolved. The Board noted in addition that medical personnel had concluded that the bronchospasm was most likely due to "cardiac decompensation" rather than to a primary process such as asthma. R. at 368–69. Accordingly, the Board concluded that there was "no evidence" that a pulmonary disease, including an asthma attack aggravated by his service-connected psychiatric disorder, contributed materially or substantially to the veteran's death. *Philbrick,* BVA 92-____, 18–19.

2. **Residuals of Frozen Feet:** As to the appellant's contention that the veteran's service-connected residuals of frozen feet may have caused a blood clot that caused the veteran's fatal myocardial infarction, the Board correctly stated that the record contained no medical evidence demonstrating such a causal relationship, and that no medical examiner had expressed an opinion that such a relationship had existed at the time of death. *Philbrick,* BVA 92-____, at 16.

**B. Cardiovascular Disease, Beriberi Heart Disease, and Malnutrition**

■ In the "REASONS AND BASES" section of its decision, the Board correctly stated that the veteran's service medical records revealed no cardiovascular disorders. Although the report of a November 1945 Army examination contains a systolic blood pressure reading of 142, subsequent examinations conducted in 1946, 1948, and 1975 yielded normal blood pressure readings. R. at 12, 45, 67, 110; *Philbrick,* BVA 92-____, at 8–9; *see* 38 C.F.R. § 38 C.F.R. § 4.104, Diagnostic Code 7007 (1992) (minimum rating for hypertensive heart disease requires, inter alia, *sustained* diastolic hypertension of 100 or more). As to the sworn testimony of the veteran that he had been warned to avoid strenuous physical activity and mental strain, the appellant asserts that, pursuant to 38 U.S.C.A. § 1154(b) (West 1991), "[t]he BVA's opinion cannot be substituted for the combat veteran's testimony, and in the absence of contradicting evidence, the veteran's testimony must be accepted as fact". Appellant's Resp. to the Secretary's Resp., at 4. Section 1154(b) provides that, in the case of

any veteran who has engaged in enemy combat, inter alia, the Secretary "shall accept as sufficient proof" of in-service causation of any disease or injury "satisfactory lay or other evidence of service incurrence or aggravation ... if consistent with the circumstances, conditions, or hardships of such service, notwithstanding the fact that there is no official record of such incurrence or aggravation". The veteran was not competent to render an opinion requiring medical knowledge, and the Board found his testimony unpersuasive as to the in-service incurrence of heart disease; likewise, the Board concluded correctly that neither the appellant nor her daughter was competent to testify that the veteran's symptoms were manifestations of heart disease. *See Espiritu v. Derwinski*, 2 Vet.App. 492, 494–95 (1992) (lay witness not competent to offer evidence that requires medical knowledge). Quoting from a medical treatise, relevant excerpts of which are included in the record on appeal (Supp.R. at 381–87) (*see Hatlestad v. Derwinski*, 3 Vet.App. 213 (1992)), the Board found that the veteran was at risk of heart disease due to non-service-related risk factors, including obesity, hypertension (three times higher), smoking (two times higher), and family history of heart disease—factors noted in the IME report as well.

As to the appellant's assertion that beriberi heart disease or other cardiac disease had been incurred in service due to malnutrition and had contributed to the veteran's death, the Board correctly stated that no such diagnosis had been made "during the veteran's lifetime by a practicing physician who had personally conducted an examination of the veteran and who was aware of his history," and that the autopsy report did not contain a finding of beriberi heart disease or residual heart pathology related to malnutrition. *Philbrick*, BVA 92–___, at 12. The Board noted that Drs. Atkinson and Kasper, who were aware of the veteran's nutritional deprivation in service, had stated that it was "highly unlikely that cardiac impairment related to deprivation as a [POW] could have played a significant role" in the veteran's death. As to Dr. Onstad's opinion to the contrary, the Board noted that he did not affirmatively state a finding of beriberi heart disease; the Board's discussion of Dr. Onstad's report concludes that the report was "highly speculative" and "not supported by definitive findings specific to the veteran". *Philbrick*, BVA 92–___, at 13. Similarly, the Board found Dr. Platter's August 1992 opinion to be "speculative and nonspecific to the veteran". *Ibid.* The Board stated that Dr. Platter "seems to take as a given fact that the veteran had heart damage due to weight loss and multiple vitamin deficiency ...[,] a fact not shown by the record" and further noted that Dr. Platter's report "does not state what information pertaining to the veteran was provided to him for review". *Ibid.* The Board stated that Drs. Atkinson and Kasper had found that "the pathologic changes found at autopsy were not specific for, nor consistent with, beriberi heart disease". Relying on their IME report, the Board found Dr. Dilley's contrary opinion of July 1992 "to be clearly against the weight of the evidence". *Philbrick*, BVA 92–___, at 15. The Board further described Dr. Dilley's report as "suspect due to inaccuracies regarding references to asbestosis or silicosis.... These inaccuracies cast doubt on the accuracy of her reports as a whole and reasonably call into question whether her reports actually pertain to this veteran or to some other veteran." *Ibid.*

Based on its review of the record, the Board concluded that "the evidence fails to establish the presence of beriberi heart disease", and further noted that the evidence was "not so evenly divided ... as to create any doubt in this matter." *Philbrick*, BVA 92–___, at 16.

■ In her November 19, 1992, and January 25, 1993, pleadings, the appellant argued that the Board failed to give adequate weight to Dr. Platter's statements, citing to VA Veterans Benefits Administration (VBA) Circular 21–91–2, FORMER PRISONER OF WAR CLAIMS (Jan. 15, 1991), which provides, in part: "The POW rating specialists will give significant weight to [the] opinions [of a POW Physician Coordinator] and will document in their rating decisions the

reasons for not accepting the physician's judgment." VBA Circular 21–91–2, at 13. The appellant argues that, because Dr. Platter is a VA POW Physician Coordinator, his opinion "cannot be ignored by ... the BVA.... That is the intent of ... [VBA] Circular 21–91–2." Appellants' Resp. to the Secretary's Resp., at 5–6. In its decision, the Board did not identify Dr. Platter as a POW Physician Coordinator, and it failed to give "significant weight" to his opinions. To the contrary, the Board dismissed his opinion as "speculative and nonspecific to the veteran", stating: "He does not state what information pertaining to the veteran was provided to him for review so his opinion cannot be evaluated for accuracy or reliability". *Philbrick,* BVA 92–____, at 13. Furthermore, the Board did not note that Dr. Dilley is a former POW Physician Coordinator (instead misidentifying her as a "private physician" rather than a Navy employee), and the Board did not address Dr. Dilley's contention that, because she and Dr. Onstad have expertise in the fields of POW internal medicine and POW autopsies, respectively, and because Drs. Atkinson and Kasper lack experience in such matters, her opinions and those of Dr. Onstad should be given greater weight than the IME report.

The Court held in *Gilbert,* 1 Vet.App. at 59, that the statement of reasons or bases, which 38 U.S.C.A. § 7104(d)(1) (West 1991) requires be included in Board decisions, must include "an analysis of the credibility or probative value of the evidence submitted by and on behalf of the veteran in support of his claim [and] a statement of the reasons or bases for the implicit rejection of this evidence by the Board." The Court holds that the Board did not give adequate reasons or bases for rejecting the opinions of Drs. Dilley, Platter, and Onstad in favor of the opinions of Drs. Atkinson and Kasper and, therefore, that remand is required. On remand, the Board must readjudicate the appellant's claim that service-connected beriberi heart disease or residuals of malnutrition was the principal or a contributory cause of the veteran's death, taking into consideration each element of the appellant's evidence and providing rea-

sons or bases as to the weight accorded to each opinion of each of the five physicians, taking into account their experience and expertise in general and with respect to the medical sequelae of POW internment. Furthermore, the Board must describe how under VBA Circular 21–91–2 it accorded "significant weight" to the opinions of Drs. Platter and Dilley, and, if the Board finds that Circular inapplicable, state why that is so in view of the facts that (1) Drs. Platter and Dilley have had extensive experience as POW Physician Coordinators while Drs. Atkinson and Kasper have not, and (2) none of the five physicians had conducted a POW-protocol examination of the veteran during his lifetime or participated in the autopsy.

■ Additionally, on remand the Board must provide adequate reasons or bases for its reliance, as discussed *supra,* on non-service-related risk factors as predictors of heart disease, in light of its rejection of Dr. Platter's opinion as "nonspecific to the veteran" and in view of Dr. Dilley's assertion that "epidemiology has historically [been] unacceptable as a basis for individual adjudication". Supp.R. at 296. If, on remand, the Board continues to rely on unfavorable epidemiologic evidence, it must adequately address the favorable epidemiologic evidence described by Dr. Dilley in her August 1992 report and which she offered to make available on request. *See Gilbert, supra.* The Court further holds that, under the Board's obligation to "assist [the] claimant in developing the facts pertinent to the claim" under 38 U.S.C.A. § 5107(a) (West 1991), the Board had a duty to request from Dr. Dilley the evidence to which she referred. *See Murphy v. Derwinski,* 1 Vet.App. 78, 81 (1990); *Littke v. Derwinski,* 1 Vet.App. 90, 92 (1990) (VA's duty to assist includes "assisting the claimant in developing pertinent facts, from whatever source"); *White v. Derwinski,* 1 Vet.App. 519, 521 (1991) (VA duty-to-assist regulation requires Secretary to obtain private records).

### C. *Anxiety and PTSD*

■ The Board also addressed the appellant's contention that the veteran's service-

connected psychiatric disorder may have contributed to his death, stating that it had specifically requested Drs. Atkinson and Kasper to address this issue. The two physicians noted that a relationship between anxiety or stress and myocardial infarction or other acute coronary events had not been documented in peer-reviewed literature, and they concluded that they could not "state with certainty that stress either played or did not play a role" in the veteran's death. Based on these statements in the IME report, the Board stated that it was not persuaded that the veteran's service-connected psychiatric disorder had played a role in his death. *Philbrick*, BVA 92–____, at 17. The Board did not ·state why it rejected Dr. Platter's opinion that the veteran's service-connected psychiatric disability "would have increased [the] risk of terminal events [and] surgery [and hence] contributed to" his death and instead accepted the equivocal statement in the IME report as proof to the contrary. On remand, the Board must provide adequate reasons or bases for rejecting Dr. Platter's opinion and discuss the applicability of the benefit-of-the-doubt doctrine, described in part II. D., below. *See Williams v. Brown*, 4 Vet.App. 270, 273 (1993).

### D. *Benefit-of-the-Doubt Doctrine*

■ In its decision, the BVA stated that "the preponderance of the evidence is against the appellant's claim for service connection for the cause of the veteran's death." *Philbrick*, BVA 92–____, at 5. According to the benefit-of-the-doubt doctrine, 38 U.S.C.A. § 5107(b) (West 1991), an appellant need only demonstrate that there is an "approximate balance of positive and negative evidence in order to prevail". *Gilbert*, 1 Vet.App. at 54. Where, as here, "there is significant evidence in support of an appellant's claim, the Board must provide a satisfactory explanation as to why the evidence was not in equipoise." *Williams, supra.* Further, the "reasons or bases" requirement of 38 U.S.C.A. § 7104(d)(1) (West 1991) applies to the Board's application of the benefit-of-the-doubt doctrine. *Gilbert*, 1 Vet.App. at 58. If, on remand, the Board finds that the

evidence is in relative equipoise, then the appellant will be entitled to the application of the benefit-of-the-doubt doctrine. In its statement of reasons or bases, the Board should address whether the doctrine should be applied as to each material issue (including cardiovascular disease, beriberi heart disease, residuals of malnutrition, and anxiety) in connection with the claim that a service-connected disability was either the principal or a contributory cause of the veteran's death.

Moreover, the Board must consider on remand whether the evidence is in equipoise as to the contribution of the totality of the veteran's service-connected conditions as to his death, and take into account in that regard that at the time of his death the veteran suffered from eight service-connected disabilities statutorily presumed to be service-connected in POWs (stomach ulcer, irritable bowel syndrome, peripheral neuropathy of the four extremities, residuals of vitamin deficiency, and residuals of pellagra), six of which involved nutritional deficiency. *See* 38 C.F.R. § 3.309(c) (1992) (listing diseases presumed service connected if manifested in certain ex-POWs to a degree of at least 10% at any time after separation from service).

### E. *Clear and Unmistakable Error*

■ Following the Court's remand of this matter to the BVA, the appellant, in an August 1992 submission to the RO, raised a new issue: Entitlement to DIC benefits pursuant to 38 U.S.C.A. § 1318 (West 1991) and 38 C.F.R. § 3.22 (1992). Those sections provide for an award of DIC benefits where, inter alia, a deceased veteran suffered from service-connected disability continuously rated totally disabling for a period of ten or more years immediately preceding death. At the time of his death, the veteran's service-connected disabilities were rated 60% disabling, but the appellant asserts that underlying rating decisions were the result of clear and unmistakable error (CUE) and should be revised. In its decision, the Board noted that this issue had not been adjudicated by the RO, and that adjudication of it was not necessary to the resolution of the issue here on appeal.

Further, the Board noted that the Court's May 25, 1992, order directed the Board to readjudicate the remanded claim expeditiously, in view of the appellant's fragile health. *Philbrick*, BVA 92–____ at 3–4. Accordingly, the Board referred the clear-and-unmistakable-error claim to the RO for consideration. In her Response to the Secretary's Response, the appellant argues that the Board erred in failing to adjudicate her CUE claim.

Pursuant to 38 C.F.R. § 3.105(a) (1992), the Board must revise previous RO or BVA decisions which were based on "clear and unmistakable error". *See Russell v. Principi*, 3 Vet.App. 310, 313–14 (1992) (en banc). This Court has jurisdiction to review, upon a proper and timely appeal, a BVA decision that a prior final RO or BVA decision did not contain CUE within the meaning of § 3.105(a). *See* 38 U.S.C.A. §§ 7252, 7266(a) (West 1991); *Russell*, 3 Vet.App. at 314–15. However, the Court may not review such a claim in the first instance; the "necessary jurisdictional 'hook' for this Court to act is a decision of the BVA on the specific issue of 'clear and unmistakable error.'" *See Russell*, 3 Vet. App. at 315. Although the appellant asserts that the RO denied the CUE claim, the September 9, 1992, RO rating decision fails to mention that claim, and instead limits its analysis to the issue of service connection for the cause of the veteran's death. In any event, the question is whether *the BVA* adjudicated the claim. It did not, and the Court finds no error in the Board's remand of the CUE claim to the RO for development and adjudication. *Cf. Bernard v. Brown*, 4 Vet.App. 384, 392–94 (1993) (possible prejudice to appellant when BVA adjudicates issue in first instance without having afforded appellant proper notice of rights and opportunity, inter alia, to receive a hearing, to submit evidence, and to produce witnesses). Therefore, because the CUE claim is pending before the RO and was not adjudicated by the Board, it may not be reviewed by the Court. *See Russell, supra.*

### III. Conclusion

Based on the foregoing analysis, the Court vacates the October 21, 1992, BVA decision and remands the matter to the Board for prompt readjudication, consistent with this decision, on the basis of all evidence of record and applicable law and regulation. *See* 38 U.S.C.A. § 7104(a) (West 1991); *Fletcher v. Derwinski*, 1 Vet. App. 394, 397 (1991). On remand, the veteran "will be free to submit additional evidence and argument." *Quarles v. Derwinski*, 3 Vet.App. 129, 141 (1992). The Court denies the appellant's motion for oral argument because the Court does not consider that oral argument is necessary to the disposition of this appeal. For the reasons stated in *Barclay v. Brown*, 4 Vet.App. 161, 164 (1993) (memo. decision) (Court Rule 47 contemplates expedited briefing, not expedited adjudication), the Court denies as moot the appellant's motion to expedite the Court's decision. In view of the frail health of the appellant, the Board shall issue its decision not later than 45 days after the date of this decision. The Court retains jurisdiction. The Secretary shall file with the Clerk (as well as serve upon the appellant) a copy of any Board decision on remand. Within 14 days after any such final decision, the appellant shall notify the Clerk whether she desires to seek further review by the Court.

VACATED AND REMANDED.